THE ESTATE OF JAMES BUTLER, deceased,
Through Personal Representative, LEE HUNT,
and PEARL YEAST, James Butler's Wife,

   Plaintiffs

v.            No. 17-cv-682-MV-SCY

TRI-STATE CARE FLIGHT, LLC, and
Estate of David Cavigneux, deceased, through
Personal Representative VALERIE CAVIGNEAUX,

   Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Tri-State Care Flight, LLC's

Motion for Dismissal of Plaintiffs' Claims Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) [Doc. 15].

The Court, having considered the motion and relevant law, finds that the motion is well-taken and

will be granted.

## BACKGROUND

This matter arises out of a helicopter air ambulance crash on July 17, 2014, as a result of

which James Butler, a paramedic employed by Defendant Tri-State Care Flight, LLC ("Tri-State"),

was killed. The facts as alleged in Plaintiffs' Complaint for Wrongful Death and Loss of

Consortium are as follows. The helicopter air ambulance industry had high crash levels and

resulting fatalities between 2003 and 2008. Doc. 1-2 at ¶ 24. The Federal Aviation Administration

("FAA") began reviewing the regulations governing the helicopter air ambulance industry in 2003,

and the FAA Modernization and Reform Act of 2012 became law in February 2012. *Id.* at ¶¶ 25,

27. In January 2014, the FAA published new rules for helicopter safety. *Id.* at ¶ 28. In developing

the new rules, the FAA identified four common factors in the helicopter air ambulance crashes that

occurred from 1991 through 2010: inadvertent flight into instrument meteorological conditions; loss of control; controlled flight into terrain; and night conditions. *Id.* at ¶ 35.

In February 2014, the FAA announced new operational procedures and equipment requirements ("New Operational Requirements") to address the increase in helicopter air crash levels. *Id.* at ¶ 36. Although originally intended to go into effect on April 21, 2014, the effective date was extended, and as a result, the New Operational Requirements did not become mandatory for helicopter air ambulance companies until April 21, 2015, after the crash at issue in this case occurred. *Id.* at ¶¶ 39–40. Nonetheless, as of July 17, 2014, the date of the crash, Tri-State was "aware of the safety value" of the New Operational Requirements. *Id.* at ¶ 47.

As of July 17, 2014, Tri-State "had an operational control center ("OCC") to communicate with pilots, provide weather information, provide management control of flight operations, monitor flights, and assist with preflight risk information." *Id.* at ¶ 48. Also as of that date, Tri-State's OCC procedures were to: advise a pilot tasked with taking a flight whether the flight request had been refused or rejected [by] any other pilot or operator; provide weather information to the pilot; provide risk assessment of the proposed flight; require management approval of acceptance of a flight that had previously been refused or rejected because of weather; update the pilot and medical team with weather information; and monitor progress of the flight. *Id.* at ¶ 49.

Despite those procedures, Tri-State's business model established a financial incentive for management to encourage pilots to accept flights in unsafe conditions. *Id.* at ¶ 50. Specifically, Tri-State's management prohibited its OCC dispatchers from discussing weather conditions with pilots and from offering information to pilots about others who had previously refused the flight request due to weather conditions. *Id.* at ¶¶ 52–53. Whenever a pilot refused or rejected a flight, the dispatcher would record the rejection and the Tri-State owner and/or management would be

informed of the refusal.  *Id.* at ¶¶ 54–55.  When a flight request was refused, a member of Tri-State management would contact the pilot by private cell phone, rather than through the Tri-State phone system which automatically recorded calls, to pressure the pilot to accept the flight request.  *Id.* at ¶¶ 56-57.  Tri-State employees had been fired or disciplined for refusing flights because of unsafe weather conditions.  *Id.* at ¶ 58.  The culture at Tri-State was for pilots to accept as many flights as possible.  *Id.* at ¶ 59.

It is against this backdrop that, at 12:18 a.m. on July 17, 2014, a hospital in Tucumcari called Tri-State's dispatch center to request a patient transfer from Tucumcari to a hospital in Albuquerque.  *Id.* at ¶ 60.   Tri-State dispatch contacted Tri-State's Flight Crew 21, based in Tucumcari, to transport the patient.  *Id.* at ¶ 64.  Flight Crew 21 refused the flight due to dangerous weather conditions, after having earlier in the evening been forced to land in a field and reroute to Amarillo rather than return to Tucumcari because of a thunderstorm.  *Id.* at ¶¶ 62-65.  Tri-State's dispatch then contacted Tri-State's Flight Crew 23, based in Roswell.  *Id.* at ¶ 66.  Flight Crew 23 also refused the flight because of dangerous weather.  *Id.* at ¶ 67.  The westerly moving storm, which was slow moving, included heavy downpours, and fog called "creepers," "was one of the more violent storms in eastern New Mexico of the year."  *Id.* at ¶¶ 68-71.  That evening, both the Storm Prediction Center and National Weather Service Office in Albuquerque predicted severe thunderstorms, including damaging wind, fog, and hail, for the relevant region.  *Id.* at ¶¶ 72–75.

At 12:42 a.m., a Tri-State dispatcher called Tri-State's Crew 5, based in Santa Fe, and spoke with pilot David Cavigneaux to request that Crew 5 take the flight.  *Id.* at 76.  The Tri-State dispatcher did not inform Mr. Cavigneaux that two other crews had declined the flight request due to weather conditions.  *Id.* at ¶¶ 77, 80.  Mr. Cavigneaux "immediately" accepted the flight and, at 12:50 a.m., he and two paramedics, Rebecca Serkey and Mr. Butler, departed from the Santa Fe

Municipal Airport toward Tucumcari. *Id.* at ¶ 78. There is no record that Mr. Cavigneaux or the medical team received information about the weather before taking the flight or were informed that two other crews, including a crew that had just been in the Tucumcari area, had refused the flight due to dangerous weather. *Id.* at ¶¶ 79, 80. Mr. Cavigneaux "knew of and experienced pressure by the owners and management of Tri-State to take as many flights as possible and to take undue risks in dangerous weather conditions." *Id.* at ¶ 81. At 1:42 a.m. on July 17, 2014, the Crew 5 helicopter crashed into a mesa in rugged terrain, killing everyone on board. *Id.* at ¶ 82.

Based on these allegations, Plaintiffs Lee Hunt, as Personal Representative of James Butler's estate, and Pearl Yeast, Mr. Butler's wife, commenced the instant action against Tri-State and the Estate of David Cavigneaux in state court on May 16, 2017. Doc. 1-2. Tri-State filed a Notice of Removal to Federal Court on June 29, 2017. Doc. 1-3. Plaintiffs subsequently filed a motion to remand, which was denied. Docs. 45, 47. Defendant Estate of David Cavigneaux was dismissed without prejudice on December 21, 2018. Doc. 47. The Complaint alleges claims against Tri-State of wrongful death (Count I) and loss of consortium (Count II).

On July 6, 2017, Tri-State filed the instant motion to dismiss pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Doc. 15. On July 20, 2017, Plaintiffs filed a response in opposition to Tri-State's motion. Doc. 24. Tri-State filed a reply on August 3, 2017. Doc. 31.

## LEGAL STANDARD

I.  <u>Rule 12(b)(1)</u>

Rule 12(b)(1) states that a party may present the defense of lack of subject matter jurisdiction by motion. Fed. R. Civ. P. 12(b)(1). Motions to dismiss under Rule 12(b)(1) "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's

allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). If the motion is brought as a facial one, the Court must treat the plaintiff's allegations as true, just as the Court would in a motion brought under Rule 12(b)(6). *Id.* In reviewing a factual attack, a court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). In the course of a factual attack under Rule 12(b)(1), a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion. *Id.*

II.     Rule 12(b)(6)

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). When considering a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The "court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial" but to determine whether the pleadings have facial plausibility. *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The Court in *Iqbal* identified "two working principles" in the context of a motion to dismiss. 556 U.S. at 678. First, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *see Twombly*, 550 U.S. at 570 (holding that a plaintiff must "nudge" her claims "across the line from conceivable to plausible"). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (citation omitted). In keeping with these two principles, the Court explained:

> A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679.

## DISCUSSION

Defendant Tri-State argues that, because all of Plaintiffs' claims derive from a work-related accident, namely, the helicopter crash which resulted in James Butler's death, the New Mexico Workers' Compensation Act ("NMWCA"), N.M. Stat. Ann. §§ 52-5-1 to 52-5-22,

provides the exclusive remedy for Plaintiffs' injuries. Acknowledging that, in *Delgado v. Phelps Dodge Chino, Inc.*, 34 P.3d 1148, 1152 (N.M. 2001), the New Mexico Supreme Court recognized a narrow exception to the exclusive remedy provisions of the NMWCA, Tri-State argues that the facts alleged in the Complaint are not sufficiently egregious to satisfy the requirements of that exception. Accordingly, Tri-State moves for dismissal of the instant action both for failure to state a claim under Rule 12(b)(6) and for lack of jurisdiction under Rule 12(b)(1). Plaintiffs oppose the motion, arguing that the facts of the instant case fall within the *Delgado* exception. As set forth herein, the Court finds that, while the facts as alleged are indisputably tragic, they do not approximate those in *Delgado*, and thus the NMWCA provides the exclusive remedy for Plaintiffs' injuries.

## I.    Stating a *Delgado* Claim

The NMWCA provides the "exclusive remedy against employers for employees injured on the job" if certain preconditions are met. *See Hamburg v. Sandia Corp.*, 179 P.3d 1209, 1211 (N.M. 2009). The NMWCA bars claims by injured workers against their employers, as well as derivative claims for loss of consortium by dependents of the employee. *See Archer v. Roadrunner Trucking Inc.*, 930 P.2d 1155, 1162 (N.M. 1997). Thus, if Mr. Butler's claims are barred by the NMWCA, so too are the derivative claims of his estate and spouse.

The purpose of the NMWCA is to "assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers." N.M. Stat. Ann. § 52–5–1. When a worker suffers an accidental injury and the NMWCA's necessary preconditions are satisfied, the NMWCA provides a scheme of compensation that is intended to be beneficial to both parties. *Sanchez v. M.M. Sundt Constr. Co.*, 706 P.2d 158, 160–61 (N.M. Ct. App. 1985). "The injured worker receives compensation quickly," while the employer "is assured

that a worker accidentally injured, even by the employer's own negligence, will be limited to compensation under the Act and may not pursue the unpredictable damages available outside its boundaries." *Delgado*, 34 P.3d at 1152 (N.M. 2001) (citing N.M. Stat. Ann. § 52–1–9)).

To prevent abuse "from both sides of this *quid pro quo*," the NMWCA "limits the availability of compensation only to those workers 'injured *by accident* arising out of and in the course of his [or her] employment.'" *Delgado*, 34 P.3d at 1153 (quoting N.M. Stat. Ann. ¶ 52-1-2) (emphasis in original). While the NMWCA does not define "accident," it sets forth "three categories of conduct that will render a worker's injury non-compensable," providing that no compensation shall be afforded if the injury was occasioned by the worker's intoxication, if the worker willfully suffered the injury, or if the worker intentionally inflicted the injury on himself. N.M. Stat. Ann. § 52-1-11. The NMWCA thus "defines the sort of *worker* misconduct that will render a resulting injury non-accidental and therefore non-compensable, but contains no such provision with regard to *employer* misconduct." *Delgado*, 34 P.3d at 1153 (emphasis added).

Until the New Mexico Supreme Court's decision in *Delgado*, New Mexico courts used the "actual intent" test to determine "whether employer misconduct renders a worker's injury compensable under the Act." *Id.* Under that test, "in order to allege matters which [would] render an employer liable in tort outside the Act, the plaintiff [had to] allege matters indicating that the employer intended to injure the plaintiff." *Id.* (citation omitted). In turn, in order to satisfy that burden, "the worker [had to] prove that the employers intended a deliberate infliction of harm upon the employee." *Id.* (citation omitted).

In *Delgado*, the New Mexico Supreme Court "broadened the scope of the accident exception with respect to employers." *Morales v. Reynolds*, 97 P.3d 612, 615 (N.M. Ct. App. 2004). To end the disparity caused by the fact that "there was a lower standard for finding that a

worker had lost his or her benefits than for finding that an employer had lost its protection from tort liability," the *Delgado* court "held that in addition to acts *intended* to cause harm, *willful* acts by an employer would also result in the employer's loss of immunity from tort liability." *Id.* (emphasis added). The *Delgado* Court announced a conjunctive, three-part test "to be applied equally to workers and employers to determine whether an event is [willful and] non-accidental" and thus outside the scope of the NMWCA, as follows:

> (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury.

*Id.* at 615 (quoting *Delgado*, 34 P.3d at 1156).

"Beyond this test, the Court did not elaborate on the boundaries of what type of conduct qualified under the exception to exclusivity." *Morales*, 97 P.3d at 615. In *Morales*, however, the first case following *Delgado* in which the New Mexico Court of Appeals examined "the standard announced" in *Delgado*, the Court stated that "the facts of *Delgado* are helpful in illustrating what type of employer conduct the Court sought to address in broadening the non-accidental exception." *Id.* Those facts were as follows.

Delgado was working at a smelting plant, where he heated rock to temperatures greater than 2,000 degrees so that usable ore would separate from unusable slag. *Delgado*, 34 P.3d at 1151. The slag then drained into an iron cauldron or ladle that workers would empty when it reached capacity by using a "mudgun" to stop the flow of molten slag long enough to remove it. *Id.* Delgado's crew was shorthanded and being pressured to work harder in order to compensate for the loss of production and revenue incurred after a recent ten-day shutdown. *Id.* The cauldron was filling at an unusually fast—and dangerous—pace and had reached the point where it would need to be emptied, but the flow of slag could not be stopped, "resulting in the worst runaway

condition that many of the workers on the site had ever experienced." *Id.* Although the employer "could have shut down the furnace, thereby allowing the safe removal of the ladle of slag, . . . in order to avoid economic loss, [the employer] chose instead to order Delgado, who had never operated a kress-haul under runaway conditions, to attempt to remove the ladle alone, with the molten slag still pouring over its fifteen-foot brim." *Id.* When Delgado entered the tunnel and saw that the cauldron was overflowing, he "radioed for help, explaining that he was neither qualified nor able to perform the removal task." *Id.* His supervisor "insisted" that Delgado perform the task, and, "[i]n response to Delgado's renewed protest and request for help, . . . again insisted that Delgado proceed alone." *Id.* Eventually, Delgado "emerged from the smoke-filled tunnel, fully engulfed in flames." *Id.* He collapsed, saying, "Why did they send me in there? . . . I told them I couldn't do it. They made me do it anyway." *Id.* Delgado "suffered third-degree burns over his entire body and died three weeks later." *Id.* These facts, the Court explained, established that the employer "engage[d] in a series of deliberate or intentional acts which they knew or should have known would almost certainly result in serious injury or death to Reynaldo Delgado." *Id.*

In *Morales*, the Court made clear that the "decision in *Delgado* stem[med] from this egregious employer conduct," which it described as "a combination of deadly conditions, profit-motivated disregard for easily implemented safety measures, complete lack of worker training or preparation, and outright denial of assistance to a worker in a terrifying situation," and cautioned that a determination of whether "an accident meets the requirements of *Delgado* as a matter of law . . . must bear in mind the type of unconscionable conduct that *Delgado* sought to deter." 97 P.3d at 615. Accordingly, the Court explained, "the requirements of *Delgado* inform the plaintiff's burden when facing a pre-trial motion to dismiss." *Id.* at 616. Specifically, in order to survive a

motion to dismiss, a plaintiff must plead "that the employer met each of the three *Delgado* elements through actions that exemplify a comparable degree of egregiousness as the employer in *Delgado*." *Id.* In other words, "a plaintiff must allege all three *Delgado* elements: willful conduct akin to the employer's conduct in *Delgado*, the employer's state of mind, and a causal connection between the employer's intent and injury." *Id.*

II.    Application to the Instant Case

In their Complaint, Plaintiffs allege in conclusory fashion that "Tri-State intentionally acted or failed to act without just cause or excuse in a way reasonably expected to result in the death of Jamie Butler." Doc. 1-2 at ¶ 87. Plaintiffs further allege that "Tri-State either expected an injury or death to occur to a crew member like Jamie Butler, or utterly disregarded the consequences of its decisions" to pressure pilots to take flights into dangerous weather conditions, prevent pilots and medical team members from being informed that other pilots or medical teams had rejected flights, not provide pilots or medical team members information about dangerous weather conditions, and violate helicopter air ambulance safety standards, its own policies and the New Operations Requirements. *Id.* at ¶ 90. Finally, Plaintiffs, again in a conclusory fashion, allege that the crash of the Crew 5 helicopter "was caused as a result of the defendants' deliberate violation of both old safety standards for the safe operation of a helicopter, Tri-State's own policies and the New Operational Requirements." *Id.* at ¶ 83. These allegations, even read in context with the other allegations of the Complaint, are insufficient to state all three *Delgado* elements "through actions that exemplify a comparable degree of egregiousness as the employer in *Delgado*." *Morales*, 97 P.3d at 615.

A. <u>Element 1: The employer has committed an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker.</u>

"The first prong [of *Delgado*] presents an objective threshold question, namely, "whether a reasonable person would expect the injury suffered by the worker to flow from the intentional act or omission." *Delgado,* 34 P.3d at 1156. In making this determination, "[t]he critical measure . . . is whether the employer has, in a specific dangerous circumstance, required the employee to perform a task where the employer is or should clearly be aware that there is a substantial likelihood the employee will suffer injury or death by performing the task." *Dominguez v. Perovich Prop.*, 111 P.3d 721, 727 (N.M. Ct. App. 2005). In their response, Plaintiffs argue that Tri-State's actions "meet this critical measure: in a specific dangerous circumstance – severe weather at night – Tri-State *required* a helicopter crew to fly across uneven terrain despite its awareness that doing so created the substantial likelihood of a crash, which would almost certainly cause death." Doc. 24 at 14 (emphasis added). Contrary to Plaintiffs' argument, however, critically missing from the Complaint is any allegation that Tri-State in fact *required* the Crew 5 helicopter to take the flight, much less "fly across uneven terrain."

The Complaint alleges that, based on its knowledge of helicopter air ambulance studies, which led to the promulgation of new rules which, although not in effect on the date of the crash, had been disclosed as of that date, Tri-State knew that *requiring* a helicopter to fly at night into bad weather creates an unreasonably and substantially certain risk of death or great bodily harm to the pilot, the medical team and any patient who is being transported. While the Complaint goes on to allege that there was bad weather on the night of the crash, weather of which Tri-State was aware based on forecasts and the experience of an earlier helicopter crew, the Complaint does not allege that Tri-State actually *required* the deceased, Mr. Butler, or any other member of the Crew 5 helicopter, to take the flight to Tucumcari. Indeed, there are no allegations at all regarding Tri-

State's communications with Mr. Butler, in connection with the flight in question or otherwise, much less an allegation that Tri-State pressured or ordered him into taking the flight in question, or any other flight on any other occasion.

Moreover, the Complaint makes clear that, rather than succumbing to any directive, Mr. Cavigneaux, the pilot of Crew 5, *immediately* accepted the flight request, and he and two paramedics, including Mr. Butler, took off.[1]  Similarly, while the Complaint alleges that, despite its own official policies, Tri-State maintained a practice and culture of pressuring pilots to take as many flights as possible despite weather conditions, and that Mr. Cavigneaux *generally* knew of and experienced this pressure, the Complaint does not allege that, with regard to the particular flight in question, Tri-State *in fact* pressured Mr. Cavigneaux to take the flight.  Accordingly, while Plaintiffs perhaps have identified a specific dangerous circumstance, namely, adverse nighttime flying conditions, they have failed to allege, as they must, that Tri-State "required" Mr. Butler "to perform a task where [Tri-State was] or should clearly [have been] aware that there [was] a substantial likelihood [Mr. Butler would] suffer injury or death by performing the task." *Dominguez*, 111 P.3d at 727; *see also Chairez v. James Hamilton Constr.*, 215 P.3d 732, N.M. Ct. App. 2009) (finding that employee did not establish that employer engaged in intentional act reasonably expected to result in injury to employee where no one affiliated with employer required employee to perform dangerous activity that resulted in his injuries).

Nor do Plaintiffs' allegations "measure [Tri-State]'s conduct up to the employer's conduct in *Delgado*."  *Dominguez*, 111 P.3d at 727.  Here, the Complaint essentially alleges that, on a

---

[1] Further, as the Court found in its Proposed Findings and Recommendation to Deny Plaintiff's Motion to Remand, "no reasonable person could possibly conclude, as required under the first *Delgado* prong, that simply by accepting the flight, Cavigneaux 'engage[d] in an intentional act or omission, without just cause or excuse, that [was] reasonably expected to result in [Mr. Butler's death]'".  Doc. 45 at 7.

stormy night, a hospital requested a helicopter air ambulance to transport a patient from Tucumcari

to Albuquerque and that, despite dangerous flying conditions, Tri-State asked its Crew 5 helicopter

to take the flight. The pilot for Crew 5 accepted and, as a result, Tri-State effectively "sent" Mr.

Butler – a paramedic on the Crew 5 helicopter air ambulance – aboard the helicopter air ambulance

for the very purpose of performing his work as a helicopter air ambulance paramedic. The

Complaint does not suggest that, save perhaps refusing the hospital's request, there was a viable

and safe, if more costly, alternative than to send one of Tri-State's crews to pick up the patient

awaiting transport. This is in stark contrast to *Delgado*, where the employer, eschewing a viable

and safe yet more costly alternative, ordered Delgado to undertake, on his own, a task that he had

never performed and that involved entering a dark tunnel to remove molten slag that was pouring

over the brim of an iron cauldron. Further, in the instant case, there are no allegations that Mr.

Butler protested his call to duty or indicated that he was not able to perform as a paramedic on the

flight in question. Similarly, there are no allegations that the pilot indicated that he was not able

to undertake the task of flying the helicopter as requested. The allegations in the Complaint make

clear that the request for Crew 5 to take the flight was accepted on the first ask. On the other hand,

Delgado *twice* called for help, explicitly stating that he was neither qualified nor able to perform

the appointed task. Delgado's supervisors ignored his pleas, *insisting* that he alone perform the

task. The Complaint herein is devoid of allegations of any such pleas for help, or any

imperviousness or insistence by Tri-State in the face of such pleas.

New Mexico cases interpreting *Delgado* make clear that "having an employee perform a

routine, familiar task which he had performed before is not the same as sending an employee to

face certain injury." *May v. DCP Midstream, L.P.*, 241 P.3d 193, 197 (N.M. Ct. App.2010);

*Dominguez*, 111 P.3d at 727 ("Having Plaintiff perform the routine task he was asked to perform,

a task with which he was familiar and he had performed in the past, was hardly the equivalent of sending Plaintiff into certain injury."). Further, these cases consistently hold that "[t]he absence of safety measures by itself demonstrates neither intent nor an inherent probability of injury, and thus "[a]n employer's disregard for safety . . . does not mean that an employer 'specifically and willfully caused the employee to enter harm's way, facing virtually certain serious injury or death, as contemplated under *Delgado*.'" *May*, 241 P.3d at 197 (quoting *Dominguez*, 111 P.3d at 727). Finally, these cases establish that "the possibility . . . that an accident might occur" does not meet the *Delgado* standard. *Dominguez*, 111 P.3d at 727.

Applying these principles, the Court is bound to conclude that Tri-State's "acts and omissions alleged here did not approach the certainty or egregiousness of the employer in *Delgado*." *Morales*, 97 P.3d at 619. Mr. Butler was asked to perform a routine task, a task with which he was familiar and had performed in the past. Similarly, there is no indication that Mr. Cavigneaux was unqualified to pilot the helicopter in difficult weather conditions or responsibly assess the weather conditions and make decisions accordingly. Admittedly, the Complaint alleges that Tri-State sent Mr. Butler aboard the helicopter air ambulance without regard to dangerous weather conditions and without first advising Crew 5 of the forecasts, the earlier weather-related issues experienced by another crew, and the refusal of two crews to take the flight. As the Court observed in *Dominguez*, if proven to be true, this disregard for safety is "appalling." 111 P.3d at 727. "Nonetheless, such circumstances do not permit a conclusion that [Tri-State] [] specifically and willfully caused [Mr. Butler] to enter harm's way, facing virtually certain serious injury or death, as contemplated under *Delgado*." *Id.* Finally, even the known possibility that the pilot of Crew 5 might inadvertently fly into dangerous weather conditions resulting in the loss of control of the helicopter, without more, is insufficient to satisfy *Delgado*. While citing to common factors

in helicopter air ambulance crashes from 1991 to 2010, the Complaint does not allege that Tri-State had experienced crashes of its own helicopter air ambulances in similar weather conditions in the past, or even knew of any specific crashes. Indeed, the Complaint alleges that it was Tri-State's pattern and practice to encourage pilots to accept flights in unsafe weather conditions, suggesting that such flights had been completed without incident in the past.

In short, while the tragedy of the instant case is undeniable, the "combination of deadly conditions" present in *Delgado* is missing here. The Complaint does not identify any "easily implemented safety measures" that Tri-State disregarded for "profit-motivated" reasons, any "lack of worker training or preparation," or any "outright denial of assistance to a worker in a terrifying situation." *Morales*, 97 P.3d at 615. Accordingly, Plaintiffs have not alleged "willful conduct akin to the employer's conduct in *Delgado*," and thus fail to meet the first *Delgado* element. *Id.*

B. Element 2: The employer expects the intentional act or omission to result in the injury or has utterly disregarded the consequences.

"The second prong [of *Delgado*] requires an examination of the subjective state of mind of the . . . employer." *Delgado*, 34 P.3d at 1156. This prong is satisfied "if the . . . employer decided to engage in the act or omission without ever considering its consequences." *Id.* If, however, "the . . . employer did consider the consequences of the act or omission, this prong will be satisfied only when the . . . employer expected the injury to occur." *Id.* It is not enough "to prove that the . . . employer considered the consequences and negligently failed to expect the worker's injury to be among them." *Id.*

In their response, Plaintiffs argue that Tri-State's conduct satisfies the subjective prong of *Delgado* because Tri-State's knowledge "about the dangers of flight into severe weather, the procedures it was supposed to follow, and its pattern of pressuring employees to make flights despite unsafe weather demonstrates that it expected a crash to occur." Doc. 24 at 19. In support

of their argument, Plaintiffs cite to *Richey v. Hammond Conserv. Dist.*, a case in which the plaintiff's allegations were "that Defendant was notified that the specific equipment Plaintiff was required to use was dangerous and had nearly caused serious injuries to several employments; that Defendant required Plaintiff to use the equipment in spite of this knowledge and over his objections; and that as a result, Plaintiff was severely injured using the equipment." 346 P.3d 1183, 1189 (N.M. Ct. App. 2015). As discussed above, however, this is not a case where Tri-State *required* Mr. Butler to board the helicopter on the night of July 14, 2014, and there is no allegation that Mr. Butler objected to boarding the helicopter. Nor have Plaintiffs alleged that that its fleet of helicopters was dangerous, or had encountered difficulties in the past, under adverse weather conditions or otherwise.

Unlike the plaintiff in *Richey*, who alleged that his employer engaged in the intentional act of requiring him, over his objection, to use specific equipment that the employer knew was dangerous, here Plaintiffs allege that "Tri-State either expected an injury or death to occur to a crew member like Jamie Butler, or utterly disregarded the consequences" *of certain of its decisions*. Plaintiff enumerates those decisions as follows: to pressure pilots to take flights into dangerous weather conditions, prevent pilots and medical team members from being informed that other pilots or medical teams had rejected flights, not provide pilots or medical team members information about dangerous weather conditions, and violate helicopter air ambulance safety standards, its own policies and the New Operations Requirements. *Id.* at ¶ 90. None of those decisions, however, is the intentional act or omission that Plaintiffs allege caused Mr. Butler's death. To the contrary, as discussed above, the Complaint alleges that it was Tri-State's decision to send Crew 5, including Mr. Butler, to pick up a patient at the hospital in Tucumcari that resulted in the crash that killed Mr. Butler. General allegations that Tri-State pressured pilots, withheld

information from pilots and medical teams about dangerous weather conditions and rejected flights, and violated rules and regulations are insufficient to establish Tri-State's subjective intent with regard to its acts or omissions in connection with the specific flight at issue here. Indeed, the Complaint does not allege that Tri-State pressured Mr. Butler, Mr. Cavigneaux, or any member of Crew 5 to take the flight in question, nor does it specifically identify any particular rules or regulations that Tri-State violated with regard to the flight in question. Even if Plaintiffs' allegations were read to state that Tri-State "could have reasonably anticipated that an injury would occur," such allegations would not be enough to satisfy the subjective intent prong of *Delgado*. *Morales*, 97 P.3d at 619.

Moreover, as discussed above, Plaintiffs' allegations regarding Tri-State's decision to send Mr. Butler on the helicopter that ultimately crashed are not sufficient to allege an intentional act or omission reasonably expected to result in Mr. Butler's death, as contemplated by the first prong of *Delgado*. It follows that Plaintiffs' allegations are equally insufficient to state that Tri-state expected its decision to result in Mr. Butler's death, or utterly disregarded the consequences of its decision, as required by the second prong of *Delgado*. Because the Complaint does not allege that Tri-State either failed to consider the consequences of its decision to send Mr. Butler on the helicopter air ambulance on the night of July 17, 2014, or considered the consequences and disregarded the threat of harm to Mr. Butler, Plaintiffs have not alleged "the employer's state of mind," and thus fail to meet the second *Delgado* element. *Id.* at 615.

C. Element 3: An intentional act or omission proximately causes the injury.

The third prong of *Delgado* requires that "willfulness" be the "proximate cause." *Delgado*, 34 P.3d at 1156. Thus, a plaintiff must allege "a causal connection between the employer's intent and injury." *Morales*, 97 P.3d at 616. In their response, Plaintiffs argue "that the crash was a

result of Defendants' deliberate misconduct and as a result of the factors that Tri-State knew existed before it sent its crew into [adverse weather] conditions." Doc. 24 at 21. The Complaint, however, does not contain factual allegations that plausibly establish a causal connection between Tri-State's acts and omissions and Mr. Butler's death.

Specifically, Plaintiffs allege that the crash of the Crew 5 helicopter "was caused as a result of the defendants' deliberate violation of both old safety standards for the safe operation of a helicopter, Tri-State's own policies and the New Operational Requirements." *Id.* at ¶ 83. Plaintiffs further allege that "Tri-State's actions and omissions were a direct and proximate cause of Jamie Butler's death." *Id.* at ¶ 90. These statements, however, are conclusory legal statements without supporting factual allegations. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'") (quoting *Twombly*, 550 U.S. at 557). The Complaint contains no factual allegations as how Tri-State – or Mr. Cavigneaux – violated standards, rules, or requirements on the night in question, or how any such violations proximately caused Mr. Butler's death.

Further, as discussed above, Tri-State did not require or direct Mr. Butler to board the helicopter, and for this reason alone, there was "no proximate cause between any intentional conduct by [Tri-State] and [Mr. Butler's death]." *Cordova v. Peavey Co.*, 111 F. App'x 992, 995 (10th Cir. 2004) (finding that there was no proximate cause between any intentional conduct by Peavey and Cordova's injury where no one directed or required Cordova to perform the task that he was doing when he sustained his injury); *see also Morales*, 97 P.3d at 618 ("The acts or omissions that Morales argues did not cause the injurious event in the way that the acts of the employer in *Delgado* caused Delgado to be set on fire."). Because the Complaint does not allege

that Tri-State's willfulness was the proximate cause of Mr. Butler's death, Plaintiffs have not alleged a causal connection between Tri-State's intent and Mr. Butler's death, and thus fail to meet the third *Delgado* element.

## III.  Leave to Amend

Plaintiffs request that, if the Court finds that they have not adequately pled a *Delgado* claim, the Court grant them leave to amend the Complaint.  In support of their request, Plaintiffs note that because the Complaint was originally filed in state court, it was drafted to meet New Mexico's "liberal pleading standard."  Doc. 24 at 22.  Under these circumstances, the Court agrees that Plaintiffs should be granted an opportunity to amend their Complaint.

Echoing the language of the Federal Rules, New Mexico's Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." NMRA, Rule 1-008(A)(2).  New Mexico, however, has declined to follow the United States Supreme Court's interpretation of Federal Rule 8, as articulated in *Iqbal*  and *Twombly*.  Instead, New Mexico has criticized it:  "The plausibility standard created by the two U.S. Supreme Court cases adds a determination of likelihood of success on the merits so that a trial judge can dismiss a claim, even where the law does provide a remedy, if that judge does not believe it is plausible the claim will succeed."  *Madrid v. Vill. of Chama*, 2012-NMCA-071, ¶ 17, 283 P.3d 871, 876.  Thus, a party filing in New Mexico state district court should not expect to have to comply with the federal standard.

Federal Rule of Civil Procedure 15 permits a plaintiff to amend a complaint as of right only within 21 days after serving it or 21 days after service of a Rule 12(b) motion.  Fed. R. Civ. P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  But "[t]he court should freely give leave

when justice so requires." *Id.* The Court agrees that, due to the difference between the standards articulated by New Mexico and the U.S. Supreme Court, a plaintiff whose suit is removed from state court to federal court may be permitted to amend the complaint if it is determined not to comply with *Twombly* and *Iqbal*.

<u>**CONCLUSION**</u>

Plaintiffs' Complaint does not allege all three *Delgado* elements through actions that exemplify a comparable degree of egregiousness as the employer in *Delgado*. Accordingly, as currently alleged, the facts of this case do not fall within the narrow exception to the exclusive remedy provisions of the NMWCA, and dismissal pursuant to Rule 12(b)(6) for failure to state a claim is warranted. The Court, however, will grant Plaintiffs the opportunity to amend their Complaint.

**IT IS THEREFORE ORDERED** that Tri-State's Motion for Dismissal of Plaintiffs' Claims Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) [Doc. 15], is **GRANTED**. Plaintiffs' Complaint [Doc. 1-2] is dismissed pursuant to Rule 12(b)(6) without prejudice. Plaintiff shall have until April 30, 2019, to file an amended complaint.


DATED this 28th day of March, 2019.

_____
MARTHA VÁZQUEZ
United States District Judge